**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
**CASE NO. 5:07-CV-00388-KSF**

ALLIANT TAX CREDIT FUND 31-A, LTD.;          ELECTRONICALLY FILED
ALLIANT TAX CREDIT 31, INC.;
ALLIANT TAX CREDIT FUND XXVII, LTD.;
ALLIANT TAX CREDIT XXVII, INC.;
ALLIANT TAX CREDIT XI, LTD.; and
ALLIANT TAX CREDIT XI, INC.                              PLAINTIFFS

v.

NICHOLASVILLE COMMUNITY HOUSING, LLC.;
JESSAMINE COMMUNITY HOUSING, LLC.;
PRINCETON COMMUNITY HOUSING, LLC.;
BOWLING GREEN COMMUNITY HOUSING, LLC.;
WARREN COUNTY COMMUNITY HOUSING, LLC.;
HOPKINSVILLE COMMUNITY HOUSING, LLC.;
IRONWOOD DEVELOPMENT, LLC;
ROBERT A. MCMASTER; and M. VINCENT MURPHY, III          DEFENDANTS

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Alliant Tax Credit Fund 31-A, Ltd., Alliant Tax Credit 31, Inc., Alliant Tax

Credit Fund XXVII, Ltd., Alliant Tax Credit XXVII, Inc., Alliant Tax Credit XI, Ltd., and

Alliant Tax Credit XI, Inc., by and through undersigned counsel, and pursuant to Rule 56, Fed.

R. Civ. P., move the Court for an Order entering judgment in their favor, and against Defendant,

M. Vincent Murphy, III ("Murphy") and Defendant, Robert A. McMaster ("McMaster" and,

together with Murphy, "Defendants" or "the Guarantor Defendants"), for the liquidated sum of

$8,194,136 on Count II of Plaintiffs' First Amended Complaint and for the dismissal of all

counts of Murphy's Counterclaims against Plaintiffs.[1]   In further support of this Motion,

Plaintiffs show the Court as follows.

---

[1] Defaults have previously been entered against the remaining defendants.

## STATEMENT OF POINTS AND AUTHORITIES

**FACTUAL AND PROCEDURAL BACKGROUND** ................................................................. 1

**ARGUMENT** ................................................................................................................................ 3

**I.     The Summary Judgment Standard** ............................................................................. 3

      Fed.R.Civ.P. 56(c) .......................................................................................................... 3

      *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 3

      *Keeneland Ass'n, Inc. v. Earnes*, 830 F.Supp. 974 (E.D. Ky. 1993) ................................. 4

      *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................... 4

      *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 4

      Fed.R.Civ.P. 56(a) .......................................................................................................... 4

      Fed.R.Civ.P. 56(d) .......................................................................................................... 4

      *Connelly v. Wolf, Block, Schorr & Solis-Cohen*, 463 F. Supp. 914 (E.D. Pa. 1978) .......... 4

      Fed.R.Civ.P. 56(d) .......................................................................................................... 4

**II.    The Guarantor Defendants Undisputedly Failed to Perform the Obligations in
       Their Guarantee Agreements** ...................................................................................... 5

      A.    The Guarantor Defendants Did Not Cause "Completion." ..................................... 5

      B.    The Guarantor Defendants Did Not Cause "Rental Achievement." ........................ 5

      C.    The Guarantor Defendants Did Not Pay The "Development Deficits." ................. 6

      D.    Plaintiffs Gave the Required Notice ...................................................................... 7

**III.   None of the Affirmative Defenses or Counterclaims Can Survive Summary
       Judgment** ....................................................................................................................... 7

      A.    McMaster's Defenses ............................................................................................. 7

            KRS 371.065(1) ..................................................................................................... 7

            1.    Plaintiffs had no duty to modify the LPAs ................................................ 7

                 KRS 362.2-305(1) ...................................................................................... 9

i

KRS 362.2-110 ...............................................................................9

KRS 362.2-305(2).........................................................................9

*Farmers Bank and Trust Co. of Georgetown, KY v. Willmott
Hardwoods, Inc.*, 171 S.W.3d 4 (Ky. 2005) ...............................9

2.  The Guarantee Agreements Complied with KRS 371.065(1).................10

KRS 371.065...........................................................................10, 11

*Wheeler & Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609
(Ky. 2004)...........................................................................11, 13

*Duckett v. Kubota Tractor Corp.*, 2002 U.S. Dist. LEXIS 28296
(W.D. Ky. 2002)..................................................................11, 13

KRS 371.065(1) ...................................................................11, 13

B.  Murphy's defenses.................................................................................13

1.  Plaintiffs Violated No Duty of Disclosure to Murphy ............................14

*Rivermont Inn v. Bass Hotels & Resorts,* 113 S.W.3d 636 (Ky.
App. 2003)............................................................................15, 16

*O'Bryan v. Massy-Ferguson, Inc.*, 413 S.W.2d 891 (Ky. 1966) .............16

2.  No Modifications of the LPAs or the Guarantee Agreements have
been made which would relieve Murphy of liability ..............................16

3.  Plaintiffs properly removed the GP Defendants .....................................17

4.  KRS 271B.15-020 does not bar this action ...........................................18

KRS 271B.15-020 ...............................................................18, 19

KRS 271B.15-020(1)...................................................................18

KRS 271B.15-010 .......................................................................18

KRS 271B.15-010(4).....................................................................19

5.  There is no probative evidence to support Murphy's counterclaims ........19

IV.  **Plaintiffs Are Entitled To Summary Judgment on their Damages Claims** ..............20

**CONCLUSION** .........................................................................................22

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are the limited partners in six Kentucky limited partnerships ("the Limited Partnerships"), each of which was organized to develop a low-income housing project in Kentucky.[2]   Defendants, Nicholasville Community Housing, LLC, Jessamine Community Housing, LLC, Princeton Community Housing, LLC, Bowling Green Community Housing, LLC, Warren County Community Housing, LLC, and Hopkinsville Community Housing LLC ("the GP Defendants") were, prior to May 2007, the general partners of each of the Limited Partnerships.   Under Article 5.9 of the limited partnership agreements governing the Limited Partnerships ("the LPAs"), the GP Defendants agreed, *inter alia,* to build and to rent up the Limited Partnerships' apartment buildings and to pay off the Limited Partnerships' construction loans.[3]

Murphy and McMaster wholly owned, on a 50/50 basis, each of the GP Defendants.[4] Murphy and McMaster also wholly owned, 50/50, Atlin Construction, the general contractor company that was retained to build each of the Limited Partnerships' apartment buildings ("Apartment Buildings").[5]   Murphy and McMaster executed six guarantee agreements ("the Guarantee Agreements") under which they guaranteed performance and payment of the GP Defendants' obligations to Plaintiffs.[6]

---

[2] Affidavit of Brian Doran ("Doran Affi."), ¶ 3.  The Doran Affi. is attached as Exhibit A.

[3] Cited excerpts from the LPA from one of the six Limited Partnerships are attached as Exhibit B. Other than the names of the parties and scheduled dates, the six LPAs were identical in all terms relevant to this action.

[4] The Operating Agreement for one of the six GP Defendants is attached as Exhibit C.  The relevant terms of the Operating Agreements for all six GP Defendants were identical.

[5] The Operating Agreement for Atlin Construction is attached as Exhibit D. Atlin Construction is identified as the Contractor at page 9 of Article 1 and at page 1 of the Schedule to the LPAs.

[6] The Guarantee Agreement for one of the six Limited Partnerships is attached as Exhibit E.  The LPA and Guarantee obligations at issue herein were assigned to the Plaintiffs in this case by six separate Assignment Agreements, one of which is attached as Exhibit F. The relevant terms of the six Guarantee Agreements and the six Assignment Agreements are identical.

On May 4, 2007, Plaintiffs removed the GP Defendants from their roles as General

Partners at each of the Limited Partnerships pursuant to Articles 11.4 and 11.7 of the LPAs.[7]

This occurred after Bank of America had declared the Limited Partnerships' construction loans

in default,[8] after Bank of America had sued to foreclose the mortgages on the Limited

Partnerships' properties,[9] and after the GP Defendants had repudiated their obligations to the

Limited Partnerships.[10]   On the date of removal, two and one half years after the deadline in the

LPAs for achieving lien free completion of construction and nearly two years after the deadline

in the LPAs for paying off the Bank of America construction loans, the GP Defendants had

failed to construct the Apartment Buildings for the Renaissance Limited Partnership; they had

failed to pay off the liens on the Apartment Buildings they constructed for the other five Limited

Partnerships; and they had left a balance of over $10 million due and owing on the Limited

Partnerships' construction loans to Bank of America.[11]

Like the GP Defendants that they owned and controlled, the Guarantor Defendants also

repudiated their obligations to Plaintiffs.  As a result, Plaintiffs filed this action on November 20,

---

[7] Doran Affi. [Exhibit A,] ¶ 4.

[8] Deposition of Norman Trepner, the Bank of America loan officer with responsibility for the Limited Partnerships' construction loans during 2006-2007 ("Trepner depo"), pp. 6:1-8:14; 10:7-12:25; 22:25-23:25; 25:10-26:3; 27:17-28:13; 29:10-30:2; 30:24-31:18; 32:11-33:2. Cited pages of the Trepner depo. are attached as Exhibit G. Copies of representative samples of the Bank of America default letters for each of the Limited Partnerships, to which Mr. Trepner referred in his deposition, are attached as Exhibit H.

[9] *Id.,* pp. 10:7-10:17; 18:19-19:8; 21:14-22:19; 24:1-25:8; 26:4-27:12; 28:14-29:8; 30:3-30:23; 31:19-32:10. *See also* Deposition of Robert McMaster ("McMaster depo."), p. 95; Deposition of Vince Murphy ("Murphy depo."), pp. 138-143. Cited pages of the McMaster depo. are attached as Exhibit I; cited pages of the Murphy depo. are attached as Exhibit J.

[10] McMaster depo., pp. 49-50 (stopped funding construction at the Renaissance Limited Partnership in late 2005), 93-95 (stopped paying amounts due to Bank of America on the Limited Partnerships' construction loans in January 2007). *See also* Murphy depo., pp. 86, 96-97.

[11] Doran Affi. [Exhibit A,] ¶ 4.  The Limited Partnerships' loan obligations with Bank of America consisted of a "Bridge Loan" and a "Multifamily Loan" on each project – each of which was covered by the Limited Partnerships' Construction Phase Financing and Reimbursement Agreement ("the Construction Loan Agreement") with Bank of America. Relevant provisions of the Construction Loan Agreement for one of the Limited Partnerships, which are identical in all relevant terms to the Construction Loan Agreements for the other Limited Partnerships, are attached as Exhibit K. The LPAs require the GP Defendants to pay off these construction loans [Exhibit B, Art. 1, p.11 and Art. 5.9B,] and they refer to and specify the amounts of these loans. *See* Exhibit B, pp. 5 and 8-9 of Article 1, Article 6.5(C) and p. 1 of the Schedule to the LPA.

2007. The original complaint asserts two contract claims - Count I, for breach of the GP Defendants' LPA obligations, and Count II, for breach of the Guarantor Defendants' guaranty of performance and payment of those obligations to Plaintiffs.

On April 8, 2009, this Court granted Plaintiffs' Motion to Amend their Complaint to add two counts, which claim that Plaintiffs are entitled in equity to recover from the Guarantor Defendants for the sums that they paid to Bank of America (since these payments relieved Guarantor Defendants of their independent payment obligations to Bank of America under the guaranty agreements that they separately entered with Bank of America). Thus, the sums that Plaintiffs are seeking under their equitable claims are the very same sums that they are seeking under their Count II claims on the Guarantor Defendants' Guarantee Agreements. The only reason for this alternative theory for recovery of the amounts owed to Bank of America is that the Guarantor Defendants are alleging that their Guarantee Agreements are unenforceable under KRS 371.065. Thus, if Plaintiffs prevail on this Motion for Summary Judgment on their Count II claims, the equitable counts in the Amended Complaint become moot.

## ARGUMENT

### I.    The Summary Judgment Standard.

Summary Judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are material only if their existence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251-52. "Once a moving party has met its burden, 'its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts.'" *Keeneland Ass'n, Inc. v. Earnes*, 830 F.Supp. 974, 984 (E.D. Ky. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party must "go beyond the pleadings" and come forward with probative evidence to support its claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Summary judgment is designed to "isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-24. Thus, summary judgment may be appropriate "on all or part of the claim." Fed.R.Civ.P. 56(a).

Here, there is no dispute that obligations of the GP Defendants under the LPAs were not met and that Murphy and McMaster are liable to Plaintiffs under the Guarantee Agreements whereby they guaranteed those obligations to Plaintiffs. Additionally, the Defendants have failed to raise any material issue of fact to support any of their affirmative defenses or counterclaims. Finally, there is no genuine issue to dispute the amount of the damages sought by Plaintiffs.

If, however, this Court should find that some issue remains, in the interest of judicial economy, those issues can and should be narrowed for trial. Under Fed.R.Civ.P. 56(d):

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. . . . It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue.

This rule "imposes a duty on a court that does not fully adjudicate a case on a motion for summary judgment to make an order formulating the issues for trial, to the extent practicable." *Connelly v. Wolf, Block, Schorr & Solis-Cohen*, 463 F. Supp. 914, 920 (E.D. Pa. 1978). As part of its ability to limit the issues for trial, this Court may additionally grant summary judgment "on liability alone, even if there is a genuine issue on the amount of damages." Fed.R.Civ.P. 56(d).

4

## II.   The Guarantor Defendants Undisputedly Failed to Perform the Obligations in Their Guarantee Agreements.

Under the Guarantee Agreements, McMaster and Murphy "irrevocably and unconditionally fully guarantees the due, prompt and complete performance" of specifically referenced obligations of the GP Defendants under the LPAs.   Specifically, the Guarantor Defendants guaranteed, *inter alia*: 1) "Completion" of the construction of the Limited Partnerships' properties ("the Properties"), Exhibit E, §1(a)(i); 2) "the obligation to cause Rental Achievement," Exhibit E, §1(a)(vii); and 3) "the obligation to pay all Development Deficits," Exhibit E, §1(a)(iii), as these terms were defined in the LPAs.   None of these obligations have been performed by the Defendants.

### A.   The Guarantor Defendants Did Not Cause "Completion."

Pursuant to the LPA Definition of "Completion" at pages 7-8 of Article I and pursuant to Article 5.9A and page 1 of the Schedule to the LPA [Exhibit B,] lien free completion of the Apartment Buildings was to occur by December 31, 2004.   As noted above, however, the Renaissance Apartment Buildings have never been constructed, and there were substantial unpaid liens at all of the Properties on December 31, 2004 and at all times thereafter through to the GP Defendants' removal in May 2007.   Accordingly, the Guarantor Defendants undisputedly breached their guarantee obligations with regard to Completion.

### B.   The Guarantor Defendants Did Not Cause "Rental Achievement."

Pursuant to the LPA Definition of "Rental Achievement" at page 19 of Article I and Article 5.9E of the LPA, two things had to occur by mid 2005.[12]   One, there needed to be at least 90% rental occupancy at the Apartment Buildings for three consecutive months with net

---

[12] For Park Row, the contractually stipulated deadline was March 31, 2005; for Nicholasville Greens, Pennyrile, Creekside and Franklin Place, the contractually stipulated deadline was August 31, 2005; for Renaissance, the contractually stipulated deadline was September 30, 2005.

5

operating income (rents minus expenses) exceeding the monthly payments under the required permanent loan by at least 1.15 to 1.[13]  Second, the construction loan at the Properties needed to convert from "an interest only construction loan to an amortizing term ["permanent"] loan."[14]  In fact, neither of these things occurred.  None of the Properties reached 90% occupancy and a debt service coverage ratio of 1.15 to 1 for three consecutive months - either by mid 2005 or at any time thereafter through to the date of the GP Defendants' removal.  For these and for other reasons, none of the Properties met the conditions required under the Bank of America loan documents for converting the construction loan to permanent status; thus, none of the construction loans converted – either by mid 2005 or at any time thereafter through to the date of the GP Defendants' removal.[15]  Accordingly, Defendants undisputedly breached their guarantee obligations with regard to Rental Achievement.

### C.    The Guarantor Defendants Did Not Pay The "Development Deficits."

Pursuant to the LPA Definition of "Development Deficits" at page 11 of Article I and pursuant to Article 5.9B of the LPAs, the GP Defendants were obligated to pay the excess costs necessary to "complete the Construction" of the Properties, "achieve the Conversion Date," and "pay…[off] the Bridge Loan," among other obligations.  As explained above, however, the GP Defendants and the Guarantor Defendants refused to fund completion of construction at Renaissance, they refused to pay off the liens at any of the Properties, they failed to convert the Limited Partnerships' construction loans, and they failed to pay off the Limited Partnerships' Bridge Loans – thereby leaving an unpaid balance of over $10 million on the Limited Partnerships' loans with Bank of America and causing the Properties to go into foreclosure.

---

[13] *See* LPA Definition of "Debt Service Coverage Ratio," at Article I, page 10.
[14] *See* LPA Definition of "Conversion Date," at Article I, page 9.  The conditions for conversion were set forth at Sections 9.27 and Schedule E to the Bank of America Construction Loan Agreements [Exhibit K.]
[15] *See* Trepner depo. [Exhibit G,] pp. 10-12, 20-21; McMaster depo. [Exhibit I,] pp. 63-64, 67-69, 82-83, 107.

Plainly, the Defendants have breached their guarantee obligations to pay the Development Deficits.

### D.     Plaintiffs Gave the Required Notice.

By letters dated April 10, 2007, Plaintiffs informed the GP Defendants at each Limited Partnership that they were in default of their obligations under the LPAs. [Sample letter attached as Exhibit L.]  By letters dated April 10, 2007, Plaintiffs also informed Murphy and McMaster that the GP Defendants were in default of their obligations under the LPAs and demanded performance of the Defendants' obligations under their Guarantee Agreements. [Sample letter attached as Exhibit M.]   Neither the GP Defendants nor McMaster and Murphy has ever responded; thus it is undisputed that the Guarantor Defendants are in breach of the obligations under the Guarantee Agreements.

### III.     None of the Affirmative Defenses or Counterclaims Can Survive Summary Judgment.

### A.     McMaster's Defenses.

McMaster has asserted essentially two defenses to liability on his Guarantee Agreements. First, McMaster alleges that Plaintiffs should have modified the LPAs in such a way as to make it easier for the GP Defendants to satisfy their Development Deficit Obligations.   Second, McMaster asserts that the Guarantee Agreements are unenforceable under KRS 371.065(1). Neither defense enables McMaster to avoid summary judgment.

### 1.     Plaintiffs had no duty to modify the LPAs.

McMaster complains that the Plaintiffs should have funded their capital contributions to the GP Defendants on a more "accelerated" basis.  He also complains that Plaintiffs should have calculated the total amount of capital due without any reduction for the delays in delivery of the tax credits.  Each point is addressed below.

First, as to timing, it is undisputed that Plaintiffs funded their capital contributions precisely as the LPAs required. At Renaissance, Plaintiffs funded all of the capital contributions except the contribution due upon the completion of construction of all of the Apartment Buildings and the contribution due upon Rental Achievement and, at the other Properties, Plaintiffs funded all of the capital contributions except those due upon Rental Achievement.[16] Because it is undisputed that Renaissance is not fully built and that Rental Achievement has not occurred at any of the Properties, the timing of Plaintiffs' capital contributions was proper. Indeed, McMaster concedes that Plaintiffs timely made all of the capital contributions they were required to make under the terms of the LPAs.[17]

As to the propriety of reducing the amount of the capital contributions on the basis of delays in the delivery of tax credits, that is solely an issue of damages. The capital contributions that were funded by Plaintiffs at the six Limited Partnerships totaled $8,593,242.00 These were the exact amounts provided for under Article 3.4 of the LPAs (except for *de minimus* amounts at Creekside and Park Row),[18] without any reductions for the delays in delivering the tax credits. The tax credit reductions have merely been factored into Plaintiffs' calculation of the Development Deficit in this case. *See, infra,* pp. 20-21. Moreover, in any event, McMaster concedes, as he must, that the LPAs give Plaintiffs the right to reduce the amount of capital based upon delays in the delivery of tax credits.[19] Here again, McMaster simply claims that Plaintiffs should have been willing to modify the LPA terms on this point.

---

[16] Doran Affi. [Exhibit A,] ¶ 5. The timing and amount of the capital contributions for each Limited Partnership is provided in Article 3.4 of the LPA [Exhibit B.]

[17] McMaster depo. [Exhibit I,] pp. 70-71, 171-72.

[18] Doran Affi., ¶ 6.

[19] McMaster depo. [Exhibit I,] pp. 59, 61-62, 100. Article 3.8 of the LPA governs the upward and downward adjustments of the capital contributions and plainly provides for a downward adjuster in the event that the tax credits are delayed. Because of the GP Defendants' delays in building and renting up the Apartment Buildings, the delivery of the tax credits was delayed on each Limited Partnership. *Id.,* pp. 59-62; Doran Affi. [Exhibit A,] ¶ 7A; Murphy depo. [Exhibit J,] pp. 93-94. Notably, while Plaintiffs' calculation of the credits to which Defendants are entitled

McMaster's admissions that Plaintiffs' capital contributions were made in compliance with the terms of the LPAs defeats his argument here.  Plaintiffs owed no fiduciary duty to McMaster or to any other defendant.  The Plaintiffs were limited partners; under KRS 362.2-305(1): "A limited partner does not have any fiduciary duty to the limited partnership or to any other partner solely be reason of being a limited partner."  Although parties may enter into a contract that establishes other terms,[20] including establishing fiduciary relationships, no portion of the LPAs or the Guarantees purports to subject Plaintiffs to a fiduciary standard.  Indeed, to the contrary, the LPAs state that "[t]he Investor Limited Partner shall be liable *only* to make its Capital Contribution as and when due under this agreement and otherwise to comply with its obligations hereunder."  Exhibit B, Art. 3.7 (emphasis added); *see also* Exhibit B, Art. 7.2.

As the Plaintiffs owed no fiduciary duty to the GP Defendants or their owners, Plaintiffs had no duty to waive their rights under or amend the LPAs for the benefit of those parties.  At most, the Plaintiffs were required to discharge their duties under the LPAs and, under KRS 362.2-305(2), "exercise any rights consistently with the obligation of good faith and fair dealing."  The enforcement of rights and obligations as they are set forth in a contract, however, does not violate the duty of good faith and fair dealing.  *Farmers Bank and Trust Co. of Georgetown, KY v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005).

In *Farmers*, the plaintiff had an outstanding loan from Fifth Third Bank on which his business's real property was mortgaged.  *Id.* at 6.  Seeking to finance his business with a loan from a different bank, the plaintiff applied for a real estate loan from the defendant, Farmers Bank and Trust Co. ("Farmers"), and negotiated a line of credit from National City Bank, which

---

provides for a downward adjuster based on the delays in the tax credits, Plaintiffs have given Defendants the benefit of an upward capital adjuster, pursuant to the LPAs terms, based upon the delivery of more credits than originally projected. Doran Affi., ¶7A.  Apparently, Defendants want to get the contractually stipulated benefit of the upward capital adjuster but not the contractually stipulated disbenefit of the downward capital adjuster.
[20] *See* KRS 362.2-110

was also to serve as his operating bank. *Id.* If the plaintiff were able to secure these new loans, the Fifth Third Bank mortgage would be released. *Id.*

The terms of the plaintiff's agreement with Farmers provided that the loan was to close on August 10, 1996. *Id.* On that date, however, because National City Bank had opted not to serve as the plaintiff's operating bank, the loan with Farmers did not close. *Id.* at 7. Although the plaintiff sought to subsequently close the loan, Farmers refused. *Id.*

As part of his action, the plaintiff alleged that Farmers had breached its duty of good faith and fair dealing by "failing to inform . . . [the plaintiff] that National City Bank's participation as operating bank was a precondition to the loan, and failing to make all reasonable preparations to ensure that a closing date of August 10, 1996, was possible." *Id.* at 11. The court refused to find that Farmer's had breached this duty merely by exercising its contractual rights:

> [T]he loan did not close on August 10, 1996, because . . . [the plaintiff] was not in a position to close, and on that date, the contract expired. An implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights. When the expiration date passed, Farmers had a contractual right to terminate the loan agreement.

*Id.* at 11 (Internal citations omitted). Likewise, in this case, Plaintiffs are entitled to enforce the LPAs as they are written.

                    2.      The Guarantee Agreements Complied with KRS 371.065(1).

KRS 371.065 states, in pertinent part:

> (1) No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates. . . .

"KRS 371.065 plainly provides that a guaranty agreement 'which either is . . . written on or . . . expressly refer[s] to, the instrument or instruments being guaranteed' is not required to

specify the guarantor's maximum liability or the guaranty's termination date." *Wheeler &
Clevenger Oil Co., Inc. v. Washburn*, 127 S.W.3d 609, 614-15 (Ky. 2004). Here, the Guarantee
Agreements expressly refer to the LPA provisions that they guarantee; thus, they are exempted
from the requirements of the statute.

The Guarantee Agreements specifically refer, at §§1(A)(i) – (vii), to the LPA provisions
guaranteed by the Guarantor Defendants. Moreover, in each Guarantee Agreement, before
stating the purpose of requiring "the Guarantors to guarantee … certain obligations of the
General Partner under the Agreement" the Guaranty defines the term "Agreement" as the
"Amended and Restated Agreement of Limited Partnership dated as of …." In each Guarantee
Agreement, the corresponding LPA is referred to throughout. Because the Guarantee
Agreements expressly refer to their underlying LPAs, the requirements of KRS 371.065 do not
apply, and the Guarantee Agreements are enforceable under Kentucky law.

The Guarantor Defendants are apparently relying on an unpublished federal district court
opinion, *Duckett v. Kubota Tractor Corp.,* 2002 U.S. Dist. LEXIS 28296 (W.D. Ky. 2002), to
support the contention that the LPAs (to which their guarantees undisputedly refer) are not the
"instrument . . . being guaranteed" within the meaning of KRS 371.065(1). However, the
transaction at issue in *Duckett* was materially distinguishable from that at issue here; moreover,
the Guarantor Defendants' reading of *Duckett* can not survive the subsequent holding to the
contrary by Kentucky's highest court in *Wheeler.*

In *Duckett,* the owners of a Kubota Tractor Company ("KTC") dealership, the Wilson
Dealership, were sued on their guarantee of the Wilson Dealership's purchases from KTC. The
guaranty was written on the Wilson Dealership's KTC Dealer Sales and Service Agreement,
which "set up a business relationship between the Wilson Dealership and KTC whereby KTC

11

would sell Kubota equipment to the Wilson Dealership on credit." *Id.* at \*2.  The issue in *Duckett* was whether the KTC Dealer Sales and Service Agreement was the instrument being guaranteed. *Id.* at \*4. (The parties seeking to invalidate the guarantee "contend that the Guarantees did not guaranty the [Dealer Sales and Service] Agreement; rather, the Guaranties provided open-ended coverage for the various purchase orders and other commercial paper executed between KTC and the Wilson dealership.  Thus, they were not 'written on' the instruments being guaranteed.") Concluding that "the [Dealer Sales and Service Agreement] creates no independent obligations to be guaranteed," the *Duckett* court held that, to comply with the statute, the guarantee needed to be written on or to refer to the subsequent purchase orders and other commercial paper executed between KTC and the Wilson dealership.  *Id* at \*9.

Here, to the contrary, there were no subsequent agreements between the Plaintiffs and the GP Defendants which created the obligations being guaranteed by the Guarantor Defendants; instead, those obligations, *i.e.,* to construct and rent up the Limited Partnerships' Properties and to pay off the Limited Partnerships' construction loans, were indisputably created by the LPA provisions that were referenced in the Guarantee Agreements.  Indeed, Plaintiffs were not even party to the agreements that the Guarantor Defendants must of necessity contend to constitute the instruments being guaranteed, *i.e.,* the construction agreements between the GP Defendants and the general contractor and the construction loan agreements between the GP Defendants and Bank of America.[21]

---

[21] The Limited Partnerships' Construction Loan Agreements are specifically referenced in the LPAs. [Exhibit B, pp. 5 and 8-9 of Article 1, Article 6.5(C), and p. 1 of the Schedule to the LPA.]  As for the agreements to construct the Limited Partnerships' Properties, these agreements were between the GP Defendants (wholly owned by the Guarantor Defendants), on the one hand, and Atlin Construction (also wholly owned by the Guarantor Defendants), on the other, and they are specifically referenced at page 8 of Article 1, at Article 6.5(E) and at page 1 of the Schedule to the LPAs.

Moreover, to the extent that Plaintiffs read *dictum* in *Duckett* to stand for the proposition that the obligation must be quantified in the instrument being guaranteed, such a construction of KRS 371.065(1) is precluded by the Kentucky Supreme Court's subsequent holding in *Wheeler*. The credit application to which the guaranty in *Wheeler* referred did not quantify any of the obligations being guaranteed - it simply referenced obligations to be undertaken by the parties in the future. Nonetheless, the Kentucky Supreme Court still found the credit application to be a KRS 371.065(1) instrument, and it accordingly held that the guarantee's reference to the credit application complied with the statute and made the guarantors liable for all obligations that ultimately arose as a result of that application. 127 S.W.3d at 615. Similarly here, where the GP Defendants' obligations to build and to rent up the Limited Partnerships' Properties and to pay off the Limited Partnerships' construction loans not only ultimately arose as a result of – but further were independently created by - the LPA provisions referenced in the Guarantee Agreements, there can be no question but that the Guarantee Agreements are enforceable under KRS 371.065(1).

### B.   Murphy's defenses.

Although Murphy has, in addition to the defenses asserted by McMaster, asserted several additional affirmative defenses and counterclaims against Plaintiffs, there is no probative evidence to support these claims. Plaintiffs have undertaken discovery in this action to understand the facts of Murphy's claims. In early Interrogatory discovery, Murphy was asked to "[e]xplain in detail the factual basis of the defenses affirmatively raised in your Answer." Murphy's explanation consists of a one and a half page assortment of conclusions – unsupported by any facts. *See* Murphy's Responses to Interrogatories, attached as Exhibit N. When asked to "[e]xplain in detail the factual basis" of his counterclaims against Alliant, Murphy referred and

restated the facts alleged as the basis of his affirmative defenses. *Id.* at 4-5. Moreover, Murphy has produced no documents to support either his defenses or counterclaims.[22] As demonstrated below, there is no probative evidence to support the defenses and counterclaims that Murphy alleges. Thus, summary judgment is appropriate.

1.      Plaintiffs Violated No Duty of Disclosure to Murphy.

Notwithstanding his role as: (1) co-owner of the entities that served as general partners/developers of the Limited Partnerships, (2) co-owner of the entity that served as the general contractor at each of the Properties, and (3) sole owner of the entity that served as the property manager in charge, *inter alia,* of renting out the Properties,[23] Murphy asserts that his guarantee liability should be excused because he was "shut out of the loop" with respect to the problems at the Properties. [Exhibit N, p. 2.] When asked at deposition to state the particular matters about which he should have been alerted, the only specifics Murphy provided was that he was "unable to obtain any financial statements on any of the partnerships or of the limited partners." [Murphy depo., p. 26] Murphy admits, however, that he never requested any financial information from Plaintiffs, despite the opportunity to do so, and that he never complained to Plaintiffs that they were not keeping him informed about the status of the Limited Partnerships and their Properties. [*Id.*, pp. 27, 34-35.] When pressed on why he feels Plaintiffs are responsible for his alleged lack of knowledge concerning the Limited Partnerships, Murphy admitted that the party he truly faults for withholding information is McMaster:

> …You should know that I consider Robert McMaster responsible for everything that went wrong on these properties, and he has never provided me with financial statements of what he did with all the money that I loaned to him, which should have fixed everything here.

---

[22] Murphy depo. [Exhibit J,] pp. 79-83.
[23] *Id.*, pp. 14, 124. *See also* Exhibits C and D.

*Id.*, p. 243.  Similarly, Murphy admitted that Plaintiffs were not responsible for his alleged lack of knowledge:

> Q. . . . I understand you're upset with Robert [McMaster] for not telling you what was going on at the projects. . . .  But you also seem to be saying that Alliant bears some responsibility on that. . . .
>
> Q.     So you're not contending that Alliant bears responsibility for not advising you of problems at the building?
>
> A. No, I don't think I am contending that.

*Id.*, pp. 94-95.

The undisputed record reflects that there is no basis for any such contention.  Plaintiffs were aware that Murphy either co-owned or solely owned the entities in charge of developing, constructing and renting up the Properties.  Given this knowledge, there is no way that Plaintiffs could possibly have known, without notice from Murphy (which was never given), that Murphy was unaware of the problems at the Properties.  Moreover, given that the long-standing course of dealings between the parties was – with Murphy's consent - for Plaintiffs to communicate with McMaster on development issues [*Id.*, pp. 33-34,] and given that Murphy never discussed any such issues with Plaintiffs, there is no basis to conclude that Plaintiffs owed any disclosure duties to Murphy. *See Rivermont Inn v. Bass Hotels & Resorts,* 113 S.W.3d 636, 641 (Ky. App. 2003)(defendant had no duty of disclosure in the absence of fiduciary duty or prior disclosures on the same subject by the defendant).[24]

Nor, finally, can Murphy rely on the promotional statements in Plaintiffs' affiliate's website (which Murphy never saw) – or the alleged statements by Plaintiffs' affiliate's salespeople (that Murphy claims he overheard at a marketing seminar before executing the

---

[24] Murphy also admitted that he was aware, by late 2004 and/or early 2005, of the status of the construction of the Apartment Buildings and the status of the rent up of those Buildings. Murphy depo., pp. 90-91, 124, 212-214, 217. Given this admission, it is hard to understand what information he needed to be told by anyone—let alone by Plaintiffs.

LPAs) - to impose any duties upon Plaintiffs that are not contained in the LPAs.[25]  This is so, *inter alia*, because the LPAs clearly state that their terms contain the entire understanding of the parties and supersede all prior understandings [Exhibit B, Article 15.8.] *See Rivermont*, 113 S.W.3d at 641 (relying on integration clause to preclude plaintiff's reliance on alleged prior disclosures by defendant); *see also O'Bryan v. Massy-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)(same).

2.    No Modifications of the LPAs or the Guarantee Agreements have been made which would relieve Murphy of liability.

Murphy has also alleged in his Answer that "[t]he parties have mutually deviated from the specific terms of the agreements upon which the Plaintiffs' claims are based, such that a quasi new agreement or novation has occurred, and Plaintiffs have not given legal notice of an intention to return to the strict terms thereof."  When asked to provide the factual basis for this defense, Murphy stated that he had nothing specific in mind, but felt "comfortable discovery will bring out places where that has happened." [Murphy depo. Exhibit J, pp. 63-64.]

What discovery reveals is that the LPAs were never modified;[26] indeed Plaintiffs' **failure** to modify the LPAs is the basis for another of Murphy's defenses. *See* pp. 7-10, *supra*.  And given that the Guarantee Agreements specifically provide that the Plaintiffs can, without discharging the Guarantor Defendants, agree to "renew, compromise, extend, accelerate, or otherwise change the time or place of payment of or otherwise change the terms of the indebtedness" and to "grant any indulgence, forbearance, or waiver with respect to the indebtedness or any of the other obligations guaranteed thereby," Murphy's defense based on a supposed modification of the LPAs cannot survive summary judgment.

---

[25] Murphy appears to advance such assertion at page 8 of his Counterclaim and at pages 68-74 of his deposition.
[26] McMaster depo., [Exhibit I], pp. 52-53, 70-71, 171-72; Murphy depo., [Exhibit J], pp. 42-43.

3.      Plaintiffs properly removed the GP Defendants.

Murphy alleges that Plaintiffs improperly removed the GP Defendants and that these actions relieve him of his obligations under the Guarantee Agreements.  Similarly, Murphy asserts that Plaintiffs failed "to satisfy conditions precedent [by] . . . improper removal of the General Partner," Answer, p. 2.  Because Plaintiffs properly exercised their right to remove the General Partners under the terms of the LPAs, and because the damages alleged in Count II of the Complaint accrued before this removal, Murphy's argument must fail.

Under Art. 11.4A of the LPAs, Plaintiffs were granted "the right, but not the obligation, in [their] sole discretion . . upon ten (10) days' prior notice to such General Partner, to remove such General Partner . . . and to appoint itself or any of its Affiliates or any other Person to succeed such General Partner(s)" upon a "Major Default."  Among other instances, the Limited Partnerships' failure to covert the construction loans by the deadline in the Bank of America loan documents constitutes a Major Default under the Agreements. Exhibit B, Art. 11.4A(ii)(2).[27]  In light of the Limited Partnerships' failure to convert their construction loans at any of the Properties; in light of the $10 million dollar past due balance on the Limited Partnerships' construction loans; and in light of the foreclosure of the Limited Partnerships' Properties, Defendants cannot seriously contend that they were not properly removed.  Indeed, it is notable here that neither McMaster nor Murphy ever so contended - either in response to their removal or at any time over the next 9 months until they filed their Answers in this lawsuit. [Murphy depo., Exhibit J, pp. 236-37; McMaster depo., Exhibit I, pp. 112-13.]

Further, the removal of the General Partners from the Properties does not relieve Defendants of their responsibilities under the Guarantee Agreements.  Under the terms of the

---

[27] Article 11.4.A(ii)(a) references a breach of any "Project Document." Project Documents are defined at page 18 of Article I of the LPAs as "the Mortgage Notes, and any other agreement ... related to the financing...of the Apartment Complex...."

17

LPAs, the removal of the General Partner is treated as a "Voluntary Withdrawal." Exhibit B, Art. 11.4C. And, pursuant to Article 11.7:

> It is expressly understood that no Withdrawal, even if it results in the substitution of the Assignee as a Partner, shall release the Withdrawing General Partner from any liability to the Partnership or the Limited Partners *attributable to the period prior to the Withdrawal*, all of which shall survive such Withdrawal . . . .

[Emphasis added.] Here, the Completion, the Rental Achievement and the Development Deficit liabilities which are the basis of this lawsuit are all "attributable to the period prior to the Withdrawal." Prior to their removal, the GP Defendants had failed to meet their obligations to complete construction of the Apartment Buildings, to fully rent up the Properties, and to pay off the Limited Partnerships' construction loans. Prior to their removal, the GP Defendants had not only failed to pay their Development Deficits; they further repudiated their payment obligations. Indeed, it was the failure to meet these foregoing obligations that caused their removal. Under the express terms of the LPAs, the GP Defendants remain liable for the damages that have occurred because of the failure to meet these obligations; thus under the express terms of the Guarantee Agreements, the Guarantor Defendants remain liable for those obligations.

4.     KRS 271B.15-020 does not bar this action.

Murphy asserts that Plaintiffs' action is barred by the failure to comply with KRS 271B.15-020. Answer, p. 1. This statute states that a "foreign corporation transacting business in this state without a certificate of authority shall not maintain a proceeding in any court in this state until it obtains a certificate of authority." KRS 271B.15-020(1). Although three of the Plaintiffs are corporations, they are not "transacting business in this state," and thus are not required to be certified under the statute.

The term "transact business" is defined in the negative by KRS 271B.15-010, which is substantially similar to Model Business Corporation Act § 15.01. Under this statute, a

18

corporation must do more than what is necessary to permit service of process or taxation in order to be considered to be "transacting business."  KRS 271B.15-010(4).  *See also* 17 Kentucky Practice § 4.2 ("It is clear, however, that transacting business for service of process or taxation purposes may fall short of transacting business for qualification purposes [under KRS 271B.15-010].")  "The concept of transacting business usually involves regular, repeated and continuing business contacts of a local nature." 17 Kentucky Practice §4.2, n.3.

> Among the large number of other transactions which do not give rise to the requirement that a certificate of authority be obtained are the ownership of all the shares of stock in a corporation that is engaged in local business within the state or *as a limited partner in a limited partnership engaged in local business*, or taking ministerial actions such as filing financing statements or registering trademarks.

MBCA § 15.01, Official Comment (8) (emphasis added).  Here, the Plaintiff corporations were merely limited partners in a limited partnership that was engaged in the construction of an apartment building, a purely local business.  This is not a regular, repeated and continuing business so as to require them to comply with KRS 271B.15-020.  As such, Murphy's defense must be stricken.

　　　　　5.　　　There is no probative evidence to support Murphy's counterclaims.

　　　　In addition to his defenses, Murphy asserts five Counterclaims against Plaintiffs: 1) "Breach of Limited Partnership Agreements," 2) "Breach of Fiduciary Duties," 3) "Breach of Duty of Good Faith and Fair Dealing," 4) "Negligence," and 5) "Punitive Damages."  As factual basis for these claims, Murphy alleges the same facts he claims support his defenses.  He states he "had little knowledge and was not adequately or properly informed of any problems or defaults" in the Properties, Counterclaim, ¶10, as well as that Plaintiffs "took over the day-to-day management of the" Properties.  *Id.*, ¶ 13.  When asked to "[e]xplain in detail the factual basis" of his counterclaims against Alliant, Murphy referred to and restated the facts alleged as

19

the basis of his affirmative defenses. [Exhibit N, pp. 4-5.]  As the same alleged facts form the basis of both his counterclaims and defenses, there is no probative evidence to support his counterclaims, as discussed above.  Thus, summary judgment is appropriate against Murphy's counterclaims.

**IV.     Plaintiffs Are Entitled To Summary Judgment on their Damages Claims.**

The calculation of the amounts owing by the Guarantor Defendants is governed by the terms of the Development Deficit provision set forth at Article 1, page 11 of the LPAs.  The calculation is straightforward for the five Limited Partnerships where construction is complete. After crediting Defendants for the proceeds of the capital contributions and the permanent loans to which they would ultimately become entitled, the Guarantor Defendants are required, *inter alia,* to pay all excess costs necessary to finish construction at the Apartment Buildings, to pay off all liens at the Properties, to pay off the Limited Partnerships' Bridge Loans, and to convert the Multifamily Loans to permanent status.  The calculation provided for under the Development Deficit provision of the LPAs is set forth in Plaintiffs' supporting affidavit [Exhibit A, ¶ 7.]

The only item which is not subject to precise computation is the amount of the permanent loan for which the Defendants should be credited.  This is so, again, because the GP Defendants never met the conditions for obtaining a permanent loan for any of the Properties.  However, after the GP Defendants' removal by Plaintiffs, the successor general partner was able to achieve the conditions for permanent loan financing and to obtain quotes for permanent loans.  For purposes of summary judgment only, Plaintiffs have credited the Guarantor Defendants with the *highest* permanent loan quote on each of the five completed Properties.  Notably, this amount is approximately $400,000 greater than the amount that was supported, under the GP Defendants'

permanent loan commitments, by the net operating income at the Properties when the GP Defendants were removed.[28]

At Renaissance, where the GP Defendants walked away from a construction site in December 2005 because Plaintiffs would not renegotiate the LPAs, the incomplete status of the Apartment Buildings makes it more difficult to quantify the amount of the Development Deficit. This is so, *inter alia,* because the amount of the capital contribution and the permanent loan to which the GP Defendants would ultimately become entitled cannot be computed, at least for summary judgment purposes, before the Apartment Buildings are substantially complete. [Doran Affi., ¶ 9.]  As a result, for purposes of summary judgment only, Plaintiffs have calculated their damages under the alternative Rescission measure to which they are entitled under Article 7.4 of the LPAs and §1(A)(ii) of the Guarantee Agreements. *Id.,* ¶ 10. This measure simply requires the Guarantor Defendants to pay Plaintiffs back for the amounts that Plaintiffs invested into the Renaissance Properties. *Id.,* ¶¶ 10-11.  As such it gives the Guarantor Defendants the ability to complete construction – thereby eliminating the dispute over how to properly calculate that amount.   Similarly, the Rescission measure gives the Guarantor Defendants the ability to negotiate for themselves a restructuring of the tax credits at Renaissance – thereby eliminating any dispute over the "after-tax" costs of construction.[29]

---

[28] Doran Affi., [Exhibit A,] ¶ 8. Again, because the GP Defendants failed to satisfy the occupancy conditions for conversion, the permanent lender would not agree to convert. *See* McMaster depo., Exhibit I, pp. 63-64, 67-69, 82-83; Trepner depo., [Exhibit G,] pp. 10-12, 20-21, 73-74.  If the permanent lender had been willing to waive the conversion conditions, the amount of the loans to which the GP Defendants would have been entitled is derived by a mathematical formula based upon the net operating income at the Properties. *See* Exhibit K, Schedule E to the Construction Loan Agreement.

[29] In pre-trial proceedings, the Guarantor Defendants have asserted that the additional tax credits that will be generated by the cost overruns at Renaissance should substantially defray any damage to Plaintiffs at Renaissance. In fact, the LPAs address the impact of greater than projected tax credits on the computation of the Development Deficit – providing that the amount of the capital contribution to which the Defendants are ultimately entitled is increased in proportion to the increase in the tax credits. *See* Exhibit B, Article 3.8A(ii).  Plaintiffs' computation of

## CONCLUSION

In sum, it is clear that the LPA obligations that the Guarantor Defendants guaranteed under the Guarantee Agreements were not met and that the liquidated damages pursuant to the provisions of the LPAs are no less than $8,194,136.[30] Moreover, none of the Guarantor Defendants' defenses or counterclaims is sufficient to survive summary judgment. Accordingly, and for the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted. Alternatively, should Plaintiffs' summary judgment motion not be granted in full, Plaintiffs respectfully request that this Court narrow the issues for trial, find for Plaintiffs on any and all claims, and/or grant summary judgment on the issue of liability alone, with the issue of damages to be set for later trial.

Respectfully submitted,

/s/Barry D. Hunter_____
Barry D. Hunter
Catherine M. Stevens
Frost Brown Todd LLC
250 West Main Street
Suite 2800
Lexington, KY  40507
Tel.:   (859) 231-0000
Fax:   (859) 231-0011

**COUNSEL FOR PLAINTIFFS**

---

the Development Deficits at all of the Limited Partnerships has applied this contractually stipulated upward adjuster to the amount of capital credited to Defendants. [Doran Affi., ¶ 7A.]

[30] This amount is based on all amounts contributed by Plaintiffs to the Renaissance Limited Partnership to the date of this filing, with interest calculated through June 30, 2009. [Doran Affi., ¶ 10.] Accordingly, this amount is subject to adjustment through the date of entry of final summary judgment.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was served via e-mail and

by depositing in the U.S. mail, postage prepaid on this 10th day of June, 2009, to:

- **Richard Boydston**
  rb2@gdm.com
- **Mark T. Hayden**
  mth@gdm.com,mat@gdm.com,bmq@gdm.com
- **Barry D. Hunter**
  bhunter@fbtlaw.com,whockensmith@fbtlaw.com,ahorger@fbtlaw.com,plobel@fbtlaw.c
  om
- **Stan Kreimer , Jr**
  stan@johnsonward.com
- **James M. Mooney**
  jmooney@mislaw.com
- **Catherine M. Stevens**
  cstevens@fbtlaw.com,psheets@fbtlaw.com

**Jeffrey D. Horst**
Krevolin & Horst
1175 Peachtree Street
Suite 2150
Atlanta, GA 30361

/s/Barry D. Hunter_____
COUNSEL FOR PLAINTIFFS

C:\NrPortbl\LEXLibrary\10792\396040_1.DOC

23