UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:07-CV-388-KSF

ALLIANT TAX CREDIT FUND 31-A, LTD., et al.                                    PLAINTIFFS

vs.                                    **OPINION AND ORDER**

NICHOLASVILLE COMMUNITY
HOUSING, LLC, et al.                                                          DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on the cross motions for partial summary judgment by Plaintiffs on the issues of liability, damages and Defendant Murphy's counterclaims [DE 98], by Defendant McMaster on liability [DE 113], and by Defendant Murphy on liability [DE 115]. Defendant Murphy also moves for a hearing on Plaintiffs' motion for summary judgment [DE 116]. Having been fully briefed, the motions are ripe for consideration.

I.      BACKGROUND

This is an action to collect from the guarantors indebtedness arising from several limited partnership agreements and guaranties. In December 2003 and April and May, 2004, the Plaintiffs and the Defendants entered into a series of six limited partnerships for purposes of developing six low-income, senior citizen apartment buildings in Kentucky. Each limited partnership had the same basic structure, although the names of the entities involved changed. For purposes of clarity, the business relationships in the Renaissance Apartments on Kentucky, Limited Partnership ("Renaissance") are described below and referenced throughout as exemplary.

Renaissance was formed through an Amended and Restated Agreement of Limited Partnership dated December 8, 2003 ("Agreement"). [DE 113, Ex. G]. Defendants Robert A. McMaster ("McMaster) and M. Vincent Murphy, III ("Murphy") were equal co-owners of Warren County Community Housing, LLC, which was the General Partner of Renaissance. McMaster was

the Manager of the LLC.  The General Partner was responsible for all overall management and control of the business.  Agreement ¶ 5.1.  It was also responsible for building and renting the buildings and for paying off the Renaissance construction loans.  *Id.* ¶ 5.9.  The Renaissance Agreement admitted a new Alliant Investor Limited Partner ("ILP") and an Alliant Administrative Limited Partner ("ALP") into the Partnership.[1]  [Agreement, p. 1].  The ILP was to make capital contributions in excess of $4.5 million to Renaissance pursuant to a schedule corresponding to progress on completion of the project. [Agreement, pp. 23-24; Partner Information Schedule, Ex. G, Part 4, p. 15].  Low income housing tax credits generated by the project were to flow to the ILP. [DE 113-15, p. 2].   Murphy summarized the overall transaction as follows:  "Basically, the ILP is required to contribute the 'equity' and the GP is required to build the project on time and budget, and keep it leased up for fifteen (15) years after which time the project is re-financed or sold, and the GP receives approximately eighty percent (80%) of the net proceeds." [DE 119, p. 7].

The total amount of the permanent indebtedness to be obtained from Bank of America and the duration of the mortgage were identified in Agreement Exhibit E, p. 3.  A Construction Cost Breakdown and Timeline was to be received "no later than 3 weeks before closing."  [Ex. G, part 5, p. 19].  The Construction Loan Documents were identified in Exhibit K and were to be received no later than two weeks from closing.

McMaster and Murphy were also equal co-owners of Atlin Construction, LLC ("Atlin"), which was responsible for construction of the Renaissance apartments. [DE 98-6, Operating Agreement]. McMaster was the Manager of Atlin and responsible for originating and contracting work for Atlin and for administering the general operation of the company.  [*Id.*, Article I, ¶ O; Article III, ¶ 3.09]. Murphy was the Funding Member of Atlin and responsible for providing funding to pursue the goals

---

[1] Subsequently the ILP assigned its interest to Alliant Tax Credit Fund XXVII, Ltd. (Fund 27), and the ALP assigned its interest to Alliant Tax Credit XXVII, Inc. (ALP 27).  [DE 98-8, Ex. F].  More recently, Fund 27 assigned its interest to Alliant Tax Credit Fund IV, Ltd. (Fund 4), and ALP 27 assigned its interest to Alliant Tax Credit IV, Inc. (ALP 4).

2

of the company. [*Id.*, Art. I, ¶ M; Art. III, ¶ 3.08]. Ironwood Development, LLC ("Ironwood") was the "Developer" for the project, and McMaster was the Manager of Ironwood. [DE 113-15, p. 6]. McMaster was also the President of Ironwood Group, Inc., the Supervisory Agent for the Renaissance apartments. [DE 113-15, p. 10].

McMaster, Murphy, Atlin and Ironwood as active participants in the development and construction of the apartment complex were required to guarantee to the ILP the payment and performance obligations under the Agreement, including "to effectuate Completion," "to pay all Development Deficits," "to fund Operating Deficits," and "to cause Rental Achievement." [*See* DE 98-7, Ex. E; DE 113-7, Ex. C]. Plaintiffs provided the Atlin guaranty for Renaissance as an example [DE 98-7, Ex. E] ("Guaranty"), and McMaster provided signed copies of the same guaranty for each of the projects. [DE 113, Exs. A-F]. The Renaissance Guaranty was included in the Agreement as Exhibit D-2. The Guaranty defines the Agreement and states that the Guaranty is a condition of and an inducement to the ILP to enter into the partnership Agreement. The Guaranty then spells out the Agreement payment and performance obligations that are being guarantied and collectively referenced as the "indebtedness." The Guaranty was signed by McMaster as Manager of Atlin, and by McMaster and Murphy individually. *Id.*

By December 2005, five of the projects were nearing completion, but McMaster and Murphy stopped funding construction of Renaissance. [McMaster Depo., DE 98-11, pp. 50-51]. Apparently, construction costs were increasing – both materials and labor – with the result that McMaster and Murphy sought modifications of the loan documents from Plaintiffs. *Id.* at 52-53. When Plaintiffs denied modifications, Murphy ceased funding Renaissance construction. *Id.* at 49. In January 2007, Murphy stopped paying amounts due to Bank of America on the limited partnerships' construction loans. [Murphy Depo., pp. 86, 96-97]. Subsequently, Bank of America declared the construction loans for the limited partnerships in default and sued to foreclose the mortgages on the properties. [DE 98-2, p. 2].

Plaintiffs claim that the General Partner failed to construct the Renaissance apartment building, failed to pay off the liens on the other five apartment buildings, and left a balance of over $10 million due to Bank of America on the construction loans. *Id.*; DE 98-3. McMaster made efforts to sell Plaintiffs' interest in the Renaissance project to Affordable Equity Partners ("AEP"). [McMaster Depo. (DE 124-8, Ex. E), pp. 72-75]. However, Murphy would not sign a guarantee and would not release AEP, with the result that the planned sale could not go forward. *Id.* In May 2007, Plaintiffs removed all of the General Partners from the limited partnerships. *Id.* Plaintiffs claim the guarantors repudiated their obligations under the guaranty agreements, resulting in the present litigation initiated in November 2007. *Id.* at 2-3.

Default judgments have been entered against all General Partners and Ironwood. [DE 25, 30]. Plaintiffs seek judgment against McMaster and Murphy for breach of the guaranty agreements and for damages in the amount of $8,194,136. [DE 98]. Plaintiffs also seek dismissal of all of Murphy's counterclaims against Plaintiffs. *Id.*

McMaster opposes the motion for summary judgment on the ground that the guaranty agreements are not valid and enforceable under KRS 371.065 in that they fail to refer to the instrument being guarantied or to state the maximum amount guarantied and the maximum term of the guaranty. [DE 114]. In particular, McMaster argues that the Agreements are not "instruments" within the meaning of the statute. McMaster filed a motion for partial summary judgment on the guaranty agreements and repeated the same arguments verbatim. [DE 113]. In his response, McMaster also opposes Plaintiffs' calculation of damages and the use of a rescission basis for damages at Renaissance. [DE 114]. He provides a "Further Affidavit" in which he claims that certain set offs, such as developer fees and acquisition and financing services fees, were not considered. [DE 114-15]. McMaster argues that the basis for any damages for Renaissance should be "cost to complete," and that Plaintiffs failed to take appropriate steps to complete the project and otherwise to mitigate damages. [DE 114-15, pp. 23-25].

Murphy likewise opposes the motion for summary judgment. [DE 119]. Several of Murphy's arguments are based on other motions that were decided adversely to Murphy in the interim. [DE 132]. Regarding the enforceability of the guaranty, Murphy argues that the guaranty's broad reference to various obligations does not satisfy the specificity required by KRS 371.065. [DE 119]. He further claims there is no reference to an "instrument" of any kind and that any obligations can only be determined by reference to various other documents. *Id.* at 15. Murphy relies heavily on the analysis in *Duckett v. Kubota Tractor Corp.*, 2002 U.S. Dist. LEXIS 28296 (W.D. Ky. 2002).[2] *Id.* at 15-17. He argues guarantors are to be protected from "unknown" obligations and that the amount of the obligation must be specified at the time the guaranty is signed. [DE 119, pp. 19-21].

Murphy also argues that there are factual issues regarding the amount of damages, especially in light of his claims that Plaintiffs failed to mitigate damages and that the properties have residual value.[3] He contends summary judgment is not appropriate on his counterclaims in light of evidence he attaches in an effort to show that Plaintiffs did not act in good faith. *Id.* at 21-25. For the first time in this litigation, Murphy asserts that Plaintiffs do not have the capacity to sue in Kentucky. *Id.* at 22-23.

Plaintiffs replied in opposition to each Defendants' statutory construction arguments and the claims regarding damages. [DE 123, 124]. Plaintiffs also replied to Murphy's arguments regarding his defenses and counterclaims. McMaster replied in support of his summary judgment motion [DE 133], but Murphy did not. Details of these claims are reserved for the respective arguments.

---

[2] This opinion is not available on WestLaw.

[3] Murphy's brief references certain numerical pages of voluminous exhibits (see DE 119, pp. 21-22), but the documents filed electronically are not sequentially numbered. Accordingly, the Court cannot identify the specific documents Murphy relies upon.

5

## II. ANALYSIS

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### B. Enforceability of the Guaranties Under KRS 371.065

Defendants argue that the guaranties in the present case are unenforceable because they neither refer to the instruments being guaranteed, nor state the maximum liability and date of

6

termination. McMaster claims "[t]he clear purpose of KRS 371.065 is to implement the Kentucky policy that blanket guaranties are not permitted and, to be valid, a guaranty must state the maximum amount guarantied and the maximum term of the guaranty or refer to an instrument so stating." [DE 114, p. 5]. McMaster argues that "[i]nstrument" refers to "an obligation to pay a specified amount by a specified date." *Id.* at 6. The authorities relied upon do not support these broad claims. McMaster further claims the guaranties cannot be enforced "because the limited partnership agreements are not instruments." Murphy presents similar arguments and emphasizes that the amount of the obligation must be known at the time the guaranty is signed and must be evident without resort to extrinsic evidence. [DE 119].

The history of the statute sheds some light on these claims. Prior to a 1990 amendment, Kentucky's guaranty statute read as follows:

> No guaranty which is not written on the instrument involved shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates, provided that such termination shall not affect the liability of the guarantor with respect to:
>
> (1) Obligations created or incurred prior to such date, or
>
> (2) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, such obligations on or after such a date.

*APL, Inc. v. Ohio Valley Aluminum, Inc.*, 839 S.W.2d 571, 574 (Ky. Ct. App. 1992). In exchange for continued extension of credit by a materials supplier to two subsidiaries, APL, the parent corporation, agreed in 1989 to guarantee payment of the subsidiaries' obligations. In determining whether KRS 371.605 applied to APL's guaranty, the court considered the title of House Bill 286 introducing the original statute, "AN ACT relating to commercial paper." In light of the title and the requirements of Kentucky Constitution § 51, the *APL* court held that "the statute retained its exclusive applicability to guaranties of commercial paper." *Id.* at 575. Because APL's guaranty did not involve commercial paper, the statutory restrictions did not apply, and the guaranty was enforceable.

7

In 1990, the Legislature adopted a bill entitled "AN ACT relating to guaranties" and changed KRS 371.065 to read as follows:

> (1) No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates. Termination of the guaranty on that date shall not affect the liability of the guarantor with respect to:
> (a) Obligations created or incurred prior to the date; or
> (b) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, the obligations on or after the date.
>
> (2) Notwithstanding any other provision of this section, a guaranty may, in addition to the maximum aggregate liability of the guarantor specified therein, guarantee payment of interest accruing on the guaranteed indebtedness, and fees, charges and costs of collecting the guaranteed indebtedness, including reasonable attorneys' fees, without specifying the amount of the interest, fees, charges and costs.

1990 Ky. Acts ch. 38 § 1.

In *Wheeler & Clevenger Oil Co.*, 127 S.W.3d 609 (Ky. 2004), the court held that the "title of the 1990 Act clearly showed that its provisions applied to all guaranties." *Id.* at 613. The court rejected an argument that the maximum liability and termination date must be included in all guaranty agreements. *Id.* at 614-615. It held that such an interpretation ignored the exclusion of guaranties written on or referring to "the instrument or instruments being guaranteed." *Id.* at 615. In *Wheeler*, the instrument was a company application for credit, which was secured by a guaranty from the company's owner. The guaranty was contained on the front and back of the application. *Id.* at 610. Accordingly, the court upheld enforcement of the guaranty because it was "written on ... the instrument ... being guaranteed." *Id.* at 614. It noted that the requirement of stating the maximum liability and termination date "is a consumer-protection provision designed to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation. When the guaranty agreement is found on the document being guaranteed, however, that risk is negligible." *Id.* at 615.

8

Only a few other cases have considered KRS 371.065. *Intercargo Ins. Co. v. B.W. Ferrell, Inc.*, 89 S.W.3d 422 (Ky. Ct. App. 2002), involved a surety, Intercargo, who issued performance bonds for construction projects by Ferrell, Inc. ("Ferrell") and its parent company, Hammett. The president and vice president of Ferrell and Hammett and their spouses signed an indemnity agreement on behalf of Intercargo to hold it harmless from claims arising from the surety bonds. After Intercargo paid a $30,000 claim against Ferrell's bond, it sought to enforce the indemnity agreement. The corporate officers argued the indemnity agreement was not enforceable because it did not comply with KRS 371.065. The court held that "the legislature intended to expand the statute to apply to more than just those guaranties of instruments which qualify as commercial paper." However, it distinguished indemnity agreements from guaranties and held that the legislature did not intend to include indemnity agreements within the scope of the statute. *Id.* at 426. The court rejected an argument that "the legislature also intended to protect sophisticated businessmen and corporate executives from their own promises when they pledge their individual assets to secure performance bonds for their corporate ventures...." *Id.* "We do not agree that the legislative intent was to supplant the power, rights, or obligations of parties to a contract." *Id.*

*Maxx Parts and Equipment – Kentucky, Inc. v. MSD Mining Co., Inc.*, 2005 WL 1993902 (Ky. Ct. App. 2005), involved a credit application to Maxx Parts for purchases of parts and supplies by MSD Mining. The owner of MSD, Detherage, signed an individual guarantee to pay Maxx any amount due as a result of MSD's failure to pay. When Detherage sought to avoid the guaranty for failure to comply with KRS 371.065, the appellate court upheld the guaranty, stating it was written on the credit application and that *Wheeler* was controlling. *Id.* at *2.[4]

*General Electric Capital Corp. v. Kasey*, 2007 WL 162941 (W.D. Ky. 2007), involved an equipment lease between FRK Enterprises, Inc. ("FRK") and General Electric Capital Corp. ("GE")

---

[4] Judge Schroder authored the Court of Appeals Opinion, joined by Judge Minton. Both Schroder and Minton are now Justices on the Supreme Court of Kentucky.

9

and a guaranty by the defendants of FRK's indebtedness so as to induce GE to enter into the lease. The court noted that the guaranty was an "absolute guaranty" with no contingencies and that the guarantors "can be held liable on an absolute guaranty from the moment that a credit acts in reliance on the guaranty." *Id.* at *4. The guaranty stated "it was given to induce [GE Capital] to enter into a certain lease transaction ("Lease") with FRK" and guarantied "payment of any sum or sums which [FRK] may owe to you [under the Lease and its related documents]." Because the guaranty referred to the Lease, the court held that the restrictions of KRS 371.065 were not applicable and granted summary judgment in favor of GE. *Id.*

*Duckett v. Kubota Tractor Corp*, 2002 U.S. Dist. Lexis 28296 (W.D. Ky. 2002), involved a Dealer Sales and Service Agreement establishing a business relationship whereby Kubota Tractor Corp. ("KTC") would sell equipment to the Wilson Dealership ("Dealer") on credit. Appended to the back of the Agreement were four guaranties signed by the Wilsons and the Ducketts, by which they guaranteed to KTC prompt payment when due of all indebtedness that Dealer incurs to KTC. *Id.* at *2-3. The court held that all of the obligations that KTC sought to recover from the guarantors "arose outside (though as a result) of the Agreement" and that none of the purchase orders or related documents have guarantees "written on" them. *Id.* at *8. The court noted that the agreement does not create any obligation to be guaranteed without reference to other documents. *Id.* The court also held that the "Guarantees do not 'expressly refer to' any other document, so this provision of the statute does not apply." *Id.* at *9. "Despite the inequity of the result," the court held that the guaranties failed to comply with the statute and were unenforceable. *Id.* at 8-9.

Lastly, *Austin Powder Co. v. Flaugher*, 1991 WL 158749 (6th Cir. 1991), involved an open-ended credit application that included guarantees of "payment for all goods ordered" so that Little Ford Resources could purchase blasting products from Austin Powder. In response to challenges under KRS 371.065, the court held the statute inapplicable because the guaranty was written more than a year before the statute became effective.

In the present case, the guaranty was included as an exhibit within the 158-page Limited Partnership Agreement, but the exhibit itself was not signed. It appears that the guaranty may have been presented for signatures as a separate document. Fortunately, it is not necessary for this Court to ponder the meaning of "written on" in this context. Inclusion of the guaranty as an exhibit within the Agreement, however, comports with the underlying purpose of the statute of "reducing" the consumer risk of "a guarantor agreeing to guarantee an unknown obligation." *Wheeler*, 127 S.W.3d at 615. In contrast to Murphy's argument, the statute does not seek to "eliminate" unknown obligations, only to reduce the risk.

In this case, the guaranty expressly "refers to" the Agreement being guarantied and specifically identifies guarantied obligations, with references to the particular sections of the Agreement for each. Accordingly, it is the opinion of this Court that the "refer to" requirement of KRS 371.065 is satisfied. There is no additional requirement that the maximum liability and date of termination be stated. *See General Electric*, 2007 WL 162941 at *4.

Additionally, this Court is not persuaded by defendants' reliance on *Duckett*. Duckett guaranteed a Dealer Sales and Service Agreement with Kubota Tractor whereby Kubota would sell equipment to the Wilson Dealership on credit. *Duckett*, 2002 U.S. Dist Lexis 28296 at *2. The *Duckett* court interpreted "written on" to preclude a guaranty of such open account financing where the parameters of the obligation are only apparent through reference to other documents, such as future purchase orders and invoices. Two years later, however, the Supreme Court of Kentucky decided *Wheeler*, involving a business owner who guaranteed an application for credit so that his company could purchase fuel and other merchandise in the future. *Wheeler*, 127 S.W.3d at 610. The guaranty was written on the application. *Id.* The court enforced the guaranty, despite the fact that the "instrument" being guaranteed was an open ended credit application and that other documents would need to be referenced to determine the details of the obligation. *Wheeler* also noted that an enforceable guaranty could guarantee accruing interest and fees and costs of

11

collecting the indebtedness without stating any maximum liability. *Id.* at 615. The restrictions *Duckett* imposed on open ended credit instruments no longer appear to be good law.

The final question under KRS 371.065 is whether the Agreement in the present case can be an "instrument ... being guaranteed" within the meaning of the statute. Following the 1990 Amendment, it is clear that the application of the statute is broader than "guarantees of commercial paper." *Wheeler*, 127 S.W.3d at 613 ("The title of the 1990 Act clearly showed that its provisions applied to all guaranties."). A narrow interpretation of "instrument" would defeat the purpose of the 1990 Act of expanding its scope to apply to "all guarantees." *Wheeler* and *Maxx* enforced guaranties of open ended credit applications. *General Electric* enforced a guaranty of an equipment lease. The purpose of the statute "to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation" would not be furthered by excluding an agreement such as the present one when many of the details, including the maximum amount of a permanent loan from Bank of America, are spelled out in the Agreement. Moreover, most of the obligations incurred were within the control of the guarantors, as they owned and managed the companies constructing the projects and incurring the debts. It is also worth nothing that these partners and guarantors are sophisticated business people. Murphy avows he has "been a limited partner or guarantor of at least sixteen 'tax credit' housing projects throughout the southeast, and [sic] familiar with others as well." [DE 119-2, Murphy Affidavit, ¶ 3]. McMaster apparently has been involved in previous tax credit projects with Alliant. [DE 119, p. 9]. Kentucky courts have rejected arguments that "the legislature also intended to protect sophisticated businessmen and corporate executives from their own promises." *Intercargo,* 89 S.W.3d at 427.

McMaster relies on several provisions of Kentucky's UCC defining "negotiable instrument," but those definitions are confined to Article 3 regarding negotiable instruments and Article 4 regarding bank deposits and collections. McMaster has failed to show any applicability outside of that context. Additionally, KRS 355.3-104 and KRS 344.4-104 defining "negotiable instrument"

12

have little bearing on the broader term "instrument." Kentucky courts have already held that KRS 371.065 is no longer limited to commercial paper. *Intercargo*, 89S.W.3d at 426 ("We agree that the legislature intended to expand the statute to apply to more than just those guaranties of instruments which qualify as commercial paper."). McMaster cites KRS 304.5-100, but that statute does not support his position. This provision defining mortgage guaranty insurance refers to indebtedness "secured by mortgage, deed of trust, or *other instrument* constituting a lien on real estate." KRS 304.5-100, emphasis added. Thus, mortgages and deeds of trust are instruments. McMaster also acknowledges a number of statutes use the term "instrument" to refer to "conveyances of interests in real property, i.e., deeds or trust and wills." [DE 113-2, p. 6, n. 5].

The first definition of "instrument" in Black's Law Dictionary states: "A written legal document that defines rights, duties, entitlements, or liabilities, such as a contract, will, promissory note, or share certificate." Black's Law Dictionary (9th ed. 2009) at 869. Merriam-Webster's law dictionary defines "instrument" as: "a document (as a deed, will, bond, note, certificate of deposit, insurance policy, warrant, or writ) evidencing rights or duties, especially of one party to another under the law...." Merriam-Webster's Dictionary of Law (1996 ed.). Defendants have failed to provide any persuasive authority that would preclude the Agreements in the present case from being "instruments" within the meaning of KRS 371.065.

McMaster and Murphy signed guaranties that "expressly refer to the instrument or instruments being guaranteed" – the Agreements. Accordingly, the guaranties are enforceable under KRS 371.065.

    **C.**    **Murphy's Defenses and Counterclaims**

        1.    <u>Challenge to Plaintiffs' Capacity to Sue</u>

In response to Plaintiffs' summary judgment motion, Murphy raises a defense that Plaintiffs do not have a certificate of authority and, thereby, are precluded from bringing suit in Kentucky. [DE 119, pp. 22-24]. Kentucky law is clear that such a defense must be raised "at the earliest

opportunity." *Abbott v. Southern Subaru Star, Inc.*, 574 S.W.2d 684, 688 (Ky. Ct. App. 1978). "The failure of the plaintiff to obtain a certificate, if required, is a defense which will be considered waived unless raised by the defendant at the earliest opportunity." *Id.* See also *Broadcast Music v. Lyndon Lanes, Inc.*, 1985 WL 5139 at *1 (W.D. Ky. 1985) ("this defense has been waived because it cannot be said that the defendants raised it at their earliest opportunity"). Plaintiffs' complaint was filed nearly two years ago, and Murphy's answer has been filed for a year and a half. Discovery is closed, and the trial of this matter is scheduled in November. First, it is not entirely clear that KRS 271B.15-020 is applicable to parties serving as limited partners in local businesses. Second, assuming that KRS 271B.15-020 does apply, it is the holding of this Court that Murphy waived any defense of lack of capacity by not raising the issue at the earliest opportunity. *Abbott*, 574 S.W.2d at 688.

        2.       <u>Breach of Contract</u>

Murphy states there is ample evidence that "Plaintiffs were dilatory in modifying the loans" and "they defaulted repeatedly" after modification. [DE 119, p. 21]. He says "[t]hese actions arguably increased the risk to the Guarantors, in violation of the LPA." *Id.* To avoid summary judgment on his counterclaim, Murphy must do more than state he has an "arguable" claim. The non-moving party must present "significant probative evidence" to establish a genuine issue of material fact. Murphy simply points to voluminous documents, without any explanation as to how they support his claim. Plaintiffs reply that most of the documents to which Murphy refers are concerned with post removal modifications of loans between the Limited Partnerships and Bank of America. [DE 124, p. 10]. There is no modification of the Limited Partnership Agreement, much less a nonconsensual one. Indeed, Murphy argues as a separate defense that the Agreement was **not** modified. See DE 98-2, p. 16]. Murphy cannot avoid summary judgment against his claim of breach of contract.

### 3. Breach of Fiduciary Duty and Duty of Good Faith

Murphy argues that Plaintiffs breached their fiduciary duty to Murphy and McMaster by failing to mitigate damages and acting as an "opportunistic" investor. [DE 119, pp. 22-23]. Murphy does not respond at all to Plaintiffs' argument that they owed no fiduciary duty to Murphy. Plaintiffs anticipated this defense and noted in their motion for summary judgment that KRS 362.2-305(1) provides: "A limited partner does not have any fiduciary duty to the limited partnership or to any other partner solely by reason of being a limited partner." [DE 98, p. 9]. The Agreement further states that the "Investor Limited Partner shall be liable only to make its Capital Contribution as and when due under this agreement and otherwise to comply with its obligations hereunder." Ex. B, ¶ 3.7.

Murphy also claims Plaintiffs breached their duty of good faith by placing their interests in other projects ahead of this one. Kentucky case law is clear, however, that a party is entitled to enforce the rights and obligations of a contract. "An implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights." *Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). Certainly, Plaintiffs had no obligation to modify the terms of the Agreement after McMaster and Murphy refused to fund Renaissance and failed to complete the projects in a timely fashion. Murphy also states that Plaintiffs departed from the strict terms of the Agreement with "protective advances" of capital and waiver of adjustments. [DE 119, p. 23]. Plaintiffs note that one document to which Murphy refers involves a "proposal" to waive capital adjusters in a different partnership with a different party. [DE 124, p. 11]. This proposal was rejected. *Id.* at n. 12. Other documents reflect funding of Bank of American loans after Defendants breached their obligations to make payments. *Id.* at 12. By doing so, Plaintiffs saved the projects from foreclosure and even further losses. These documents do not establish a breach of the duty of good faith and fair dealing.

    4.    <u>Murphy's Counterclaims</u>

Murphy filed counterclaims against Plaintiffs for (Count I) breach of the limited partnership agreements, (Count II) breach of fiduciary duties, (Count III) breach of the duty of good faith and fair dealing, and (Count IV) negligence.  For the reasons stated above, Murphy has failed to present sufficient evidence to avoid summary judgment on the first three counterclaims.  No evidence of negligence has been offered.  Accordingly, Plaintiffs' motion for summary judgment will be granted on all of these counterclaims.

    **D.**    **Damages**

The question of summary judgment on damages presents complex issues that require further analysis.  Rather than delay this opinion, the Court will address damages by a separate opinion.

    **E.**    **Motion for Hearing on Plaintiffs' Motion for Summary Judgment**

For the reasons discussed above, Murphy's motion for hearing on Plaintiffs' motion for summary judgment is denied as moot at this time.  The Court will consider the motion again in the context of the motion for summary judgment on damages.

**III.**    **CONCLUSION**

    **IT IS ORDERED:**

    A.    Plaintiffs' motion for summary judgment against McMaster and Murphy for liability on the guaranty agreements and against Murphy for dismissal of his counterclaims [DE 98] is **GRANTED**.  Plaintiffs' motion for summary judgment on damages is **PASSED** pending further orders of the Court;

    B.    McMaster's motion for partial summary judgment on enforceability of the guaranty agreement [DE 113] is **DENIED**;

    C.    Murphy's motion for partial summary judgment on enforceability of the guaranty agreement [DE 115] is **DENIED**; and

D.  Murphy's motion for hearing on Plaintiffs' motion for summary judgment [DE 116]

   is **DENIED AS MOOT.**

This September 30, 2009.

Signed By:
*Karl S. Forester* KSF
**United States Senior Judge**